Good morning. May it please the Court. Daryl Higgins representing the Plaintiff Appellant, RSUI Insurance Company. As this Court is aware, this is an appeal from an adverse bench-tried case denying RSU recovery of monies paid in settlement to extinguish the debt caused allegedly by a primary insurance carrier, American States Insurance Company. The District Court provided two separate distinct bases for denying our recovery. One was that there was a purported gasket settlement, that as a matter of law, the gasket settlement extinguishes the subrogation rights of an excess carrier. Secondly, even if there was a valid gasket settlement, which we deny, the Court found that we failed to prove causation. Any damages, or more specifically, that RSUI failed to prove that the Barrow case could have ever settled within ASI's primary limit. Isn't that a fact question? That is a question for the Court. Under the standard of review, I'm having a hard time seeing how we can overturn that. Because the question that the Court posed is the case could be settled within primary limits. And the judgment of the trial court talks about settlement of the case, settlement of the case some 10 times, 15 times. When a plaintiff attorney is completely outrageous in his demands, suppose he wants $10 million in a case, sometimes you've got to try the case. And you have to be prepared. That's what the duty of good faith claims handling requires. I'm sorry. You're smiling, Judge. I agree. It strikes you about this case that somebody dropped the ball big time on an underlying claim. My difficulty with your position has to do with one can argue that the law ought to be that the excess carrier is owed a duty by the primary carrier to defend the case without undertaking some kind of a to do a lot more. It has a duty to defend the case and you can be the beneficiary of that. Unfortunately, I don't know that I see that in the Louisiana law. Louisiana law seems to allow you to just do exactly what they did. In Louisiana, let's go back to Great Southwest. This Court has got to review Great Southwest and the previous decision by this Court, which I thought was spot on, Great Southwest allows the excess carrier to be subrogated standing in the shoes of the insured. And while the case law is that there is no direct duty under the Gibbs case to the excess carrier, in other words, we could not have a separate lawsuit against them for failing to notify us of the claim or failing to give us their reports, etc., etc. But we stand in the shoes. Two things were necessary. Number one, alleged bad faith, which we did, and number two, payment. Those are the two triggers for us, excess carrier, standing in the shoes of the insured, a meriseal. This Court must view this case as if I am standing before you today representing a meriseal with no excess insurance. That's what the case law talks about. And imagine, if you will, Your Honors, a case, you've been sued, ten months later, knock at the door, that case we've been handling for you. By the way, we thought it was going to be within limits. But the settlement, you're the insured. The settlement relieved you of personal liability. I am the insured. RSUI is standing in the shoes of the insured as if there is no insurance. That's the way the Court must look at this. And if I am a meriseal, if there's no excess coverage in this case, why should the primary insurer get a benefit, a free ride, if you will? Because the insured in this case, a meriseal, went out with its own dollars and purchased excess coverage for its own protection. Give me a rational explanation as to why the tortfeasor should benefit because the insured went out and got excess coverage. There is no rationale for that. And Great Southwest says that. That's exactly what is stated in Great Southwest. You're standing in the shoes of the insured, and we cannot be treated any differently than the insured is being treated in this case. And in this case, every known violation of a duty of good faith defense was violated, bar none. The Court's decision, unfortunately, the trial court's decision, as we appreciated the case when it was remanded, was remanded for the determination of was there bad faith or not. Previously, the Court said you need an adjudicated judgment before you can advance a bad faith case. This Court said, no, you don't. You've made the allegations. Now, go back and prove the allegations of bad faith. That's what we thought we were doing when we went back, proving the allegations of bad faith. We demonstrated to the Court, and the Court obviously, the trial court agreed with us that there were defenses available to liability that were completely ignored. We cited to the Court a number of cases where, although it's a presumption of fault for a left-turning motorist, it's a rebuttable presumption. And there are numerous cases. I've tried many cases where I've had comparative fault on left-turning motorists before. Was 10% lost? 20% lost? 30% lost? I mean, we simply don't know, because they gambled. Going back to the causation issue, was there evidence that a reasonable insurer would have gone to trial under these circumstances and could have expected a judgment under $2 million? Okay, the operative question there is, under these circumstances, what are the circumstances? Assuming there was bad faith, assuming the primary carrier dropped the ball, was there evidence in this record that a reasonable insurer would have said, instead of paying the $2 million to settle, I would have gone to trial? No, there isn't. And the reason why is because, as the plaintiff attorney says, he was going to ask for $10 million. The trial judge says he is relying basically on the opinions of the trial attorney that nothing we could have done, anybody could have done, was going to change his opinion as to the value of the case. My question is, at what time? When he makes that statement, that is made when the discovery is over. He's got liability in his pocket. The defense has not one expert witness. No one has been deposed. He's in the driver's seat. Now, the Great Southwest talks about apportionment of fault, and who's the principal obligor. I think the trial judge was somewhat ticked off at us, is that we did not present some argument that there could be some allocation of fault. In other words, some lesser degree. You didn't have to pay $2 million, but the exposure was maybe $1 million. Going into the trial, we thought long and hard about how we could have attempted to do that. Based on the record, there is absolutely no way to evaluate what the potential value of this case was. We demonstrated, objectively, by the materials in their own claim file, that at all times, they thought this case was worth within their policy limit. That's not even in dispute. That's black and white in the record. What they failed to do is to get the necessary witnesses to present the defenses to liability, that were already conceded, to establish their beliefs. Those were lost forever. We cited to the court the Washington cases, the Washington State cases. The course was set, and there was nothing we could do to change that course at that point in time. Our obligation was contractual to come in to pay to get this case over with. The insured, in this case, if he was fully released, why is the insured coming in? Here's the testimony that says, but for their expert testimony, Louis Fay. We had an expert take the witness stand, uncontradicted, no expert witness on their part. Unequivocally says, and sets forth, I think it's trial exhibit number three, the judge in the case, this was our last witness, he says, look, is he just going to testify from his report? I said, well, yes, your honor. He says, well, why don't you just put the report in, subject to cross-examination? If that's what you want, do it. Please look at trial exhibit number three. This man, 33 years experience, credentialed immaculately, he sets forth every duty, how it was violated, and how, in the opinions of the claims-handling people, this case should have resolved within its million-dollar limit. This was a relatively minor accident. But this is an all-fact question that the trial judge sitting there asked to sort through. That's my problem. It seems like they're facts on both sides, that the judgment could have gone either way. It could have gone in your favor, it could not have, and sitting here on the causation issue, it's hard for me to see how, as a matter of law, we can say, you win. Because my burden of proof was to show that because of the bad faith claim-handling practices, the case became more burdensome and more costly. And that's a fact question. That's a fact question. And this Court, reviewing this case as a whole, if Your Honors can come to the conclusion and opinion that what was done in this case was in furtherance of what the Cousins case, the Cousins fact is, if this Court can come to the conclusion that, in this case, the insurer exercised that degree of skill, of judgment, of consideration for the welfare of the insured as a skilled professional defender of lawsuits, having sole charge of the investigation, settlement, and trial of the suit, that is what is expected that they utilize, then I lose. I walk out of this Court. As a practicing attorney for 40 years, this was an abomination. It was an object failure in every sense of the word. They took a gamble on the liability. This case will never go over a million dollars. He stipulates the liability. When that happened, I will submit to this Court, in my humble opinion, the policy limit in that case is eliminated. You, primary carrier, made that gamble at my expense, and you were wrong. And now I have to pay for your mistake? That's the issue for this Court to determine. And those are, I mean, give me something here that does not demonstrate their bad faith. What is the source of the duty that runs directly to you, as distinguished from the claims that you would cert by way of subrogation? I think by the great Southwest, it's obviously the subrogated rights, both conventionally and legally. Sorry? It's my subrogated right, conventionally and legally, to the rights of the insured. Right. And the trial court said, well, that's fine. We stand on the insured's rights. The insured walked out of here. He was covered. In essence, that's a very troubling outcome, given the obvious realities of this case. But you stand, I'm not sure when you get, what you're trying to do, what you're roughly saying is there is a duty owed without regard to subrogation. Because once you get subrogation, then you're standing on the insured's rights. And what were the insured's rights here? The insured's rights is to collect $2 million that he had to pay out of pocket because of the botched defense of this case, as if there was no insurance. But he didn't have to pay. The plaintiff released them. I am standing in the shoes of the insured. That's what the whole concept of subrogation is. The plaintiff released the insured. I am the insured. When it comes down to legal subrogation, bad faith, and payment, I am standing in the shoes of the insured. I am the insured. If he hadn't fully released, there would have been no claim. He would have had no opportunity to get an excess judgment. There would have been no opportunity. The insured can't be released. My time is up. I certainly will save time for rebuttal. Thank you, Your Honor. Mr. Joyce. John Joyce for the appellee. May it please the Court. Both prongs of Judge Affrick's ruling were fact-intensive, and they hinged on witness credibility calls made during the course of a three-day bench trial. What RSU's main complaint and its appeal is, is that Judge Affrick got the facts wrong. But Judge Affrick didn't get the facts wrong. He just decided them contrary to RSU's liking. This is a fact-intensive opinion, fact-intensive findings. It's judged by the clear error standard of appeal. What that means is Judge Affrick's facts stand, even if there's two permissible views of the evidence. It means that Judge Affrick's factual findings stand, even if this Court— What supports the finding of no causation? The finding of no causation? The Court found no causation. I don't have trouble with that. No causation, Your Honor, was based on a failure of proof. This Court, in its prior opinion, provided us the roadmap on causation. This Court said RSUI must prove causation. This Court said that RSUI or an excess insurer with subrogated rights must prove the amount above which it otherwise would have been required to pay. That's a causation finding. And in footnote four of the opinion, it narrowed down to the direct— Part of the difficulty is that the breach of the duty to defend was so severe that it's just like nobody can play second to play that bass. There's nothing left. You have no evidence out there. How could you possibly meet that burden? I mean, if you say, well, this goes off on burden of proof, on the facts of the case, what you know over here is that, as best you can tell, you know that you stipulated the liability, and you did nothing in this case. Then you ended up in the real box, and you end up with the excess carrier having to come in with the money, and then the trial court says, well, there's just no causal relationship between the burden of proof and the excess carrier. It's so thin. When you put the burden of proof in these facts and put it on those bases, you just set up the excess carrier. Now, I don't cry for the excess carrier, but what the practical effect of this is, that if I'm an excess carrier, then it's sure going to show up in the premium assessment. If you write the law this way, and allow this to go forward, that's going to be the practical effect of it. So be it. Your Honor, if I understand your question correctly, what facts did Judge Affleck find on the causation issue? I just find an extraordinary result on the facts of this case. The district court finding no causal relationship is a strange credulity to me. Maybe when I go closer to the record, there's something there for that, but I don't see it. Well, Your Honor, we believe that there's plenty of evidence in the record supporting that conclusion. Judge Affleck himself questioned these witnesses extensively on the underlying case extensively. He questioned them on the witnesses, the exhibits extensively, in addition to counsel's arguments, and what he found. You don't know what that case was worth. That's the problem. You don't know. And you say, well, the excess carrier's got to prove that the same result won't obtain. Prove what? What is quite clear is that you don't know what it was worth, but for the insured getting a lousy defense. We do know what it was worth, Your Honor. Michael Frugge, the underlying plaintiff's lawyer, testified. He testified that this case was worth $3 to $4 million from the outset. He was cross-examined by RSUI and by us. He was not affiliated with either party. He was questioned by Judge Affleck. He testified this case was worth $3 to $4 million. The fact is, as he testified for a plaintiff, sometimes you just have a good case. You have a decent plaintiff with a bad injury. And the evidence also showed it was in a good jurisdiction for the plaintiff, with good juries for the plaintiff. Michael Frugge testified to that. Drew Eversberg, who was... $3 to $4 million, I'm sure that... I know many plaintiff's lawyers can persuade themselves of how numbers... But the question is, what are the facts that underline that? Will the record show me what factual determinations of injury that was actually suffered here, etc., etc., etc., that he would have been able to prove? I do not... Yes, Your Honor, they do. Judge Affleck's findings mentioned that he considered the underlying medical damages and the testimony about her injuries. Those are facts that support the high settlement value. And two of the exhibits that he considered were the expert reports of Mr. Rice, who is an economist, and Stephanie Chalfin, who was a vocational rehab expert. Taking their opinions together, the special damages here, that would have been $2.7 million. That's without regard to general damages of a sympathetic plaintiff in a good jurisdiction who had someone whip right out in front of her and cause an accident. So there are facts in the record supporting a high judgment value to this case. It's the medical records. It's the expert reports attributing $2.7 million in special damages. It's Mr. Fruge's testimony. It is the testimony of Drew Eversberg, who is the second attorney for American States in the case, who testified that regardless of defensive actions, this case would have exceeded the primary limit. That's at record pages 3715 and 3716. Several witnesses testified on these facts, Your Honor. Really, the one witness that RSUI has relied on is their own expert, someone who wasn't involved in the underlying case, someone who is being paid $350 an hour for his opinions in our two states. His opinion was controverted. Controverted means disputed. He said this could have settled within limits. Michael Fruge, who had firsthand knowledge... I don't know which way $350 an hour cuts myself, but... Your Honor... It's an inverse relationship between the billable hour and the veracity of the witness sometimes. Exactly. He was being paid handsomely for his testimony in that case for his opinion, suffice it to say. And it was controverted by Michael Fruge. It was controverted by Drew Eversberg. And under Rule 52, Judge Afric wasn't required to do a witness-by-witness negation of each theory. So to the extent that Mr. Fay's findings weren't expressly referenced in the opinion, that's not error. There's a great case by Judge Rubin that a lot of panels here in the Second Circuit have followed that say that Rule 52 doesn't require punctilious attention to detail or a slavish tracing of claims issue-by-issue and witness-by-witness. That's not required under the rule. And Your Honor, back to the causation point, there's not a single case with similar facts that eliminates the causation requirement. That would be making new law beyond, well beyond the Louisiana Supreme Court in Great Southwest and beyond several, I think the laws of virtually every state. We cited the St. Paul Mercury case, which were similar facts decided under Texas law. Very much like this case, this circuit, this court affirmed a grant of summary judgment because the plaintiff didn't show that defensive actions caused an increase in the value. They made conclusory allegations in St. Paul Mercury, just like RSUI has done here. In the Twin Cities case arising out of the Seventh Circuit with Judge Posner, he cites a causation requirement as essential in these types of cases. In the Hemphill case we cited, the Fifth Circuit out of Mississippi, same requirement, causation. This is a tort. RSUI could have put on a different case. It could have tried to prove some of the conclusory allegations it stated, but it didn't. It just paid an expert $350 an hour to say what it wanted. And causation is, that was grist for the mill of the fact finder according to this court. It's courted great deference, especially here when Judge Afric made specific findings on witness credibility. He found Michael Fruget credible. That's one ground supporting his opinion. Second ground, unless your honors have any questions, I'd like to move on to the subrogation issue. The second ground would be the subrogation issue. It's well settled law that a subrogated plaintiff only has the rights that were given to him. Here, the case that tells us that is Great Southwest. There is no direct duty. Primary to excess insurer has no direct duty. That's also consistent with the law of most other states. The insured was fully released? The insured was fully released. When you say, so counsel officer said no, what's the argument there? I thought as I read this thing that the insured was released, but I'm not sure. It traces back to the, it's Exhibit 113. It's the settlement terms that were accepted. In Louisiana, there's a type of settlement known as a Gascay settlement. What it does, what it's intended to do is allow an insured to escape personal liability to release a primary insurer and allow a plaintiff to go straight against the excess. Because of Louisiana's direct action statute, the actual defendant needs to remain in the case as a nominal defendant. What a Gascay does is it means two things for an insured. First, it means they get a full release for things that are not insured. The second thing it means is they get a partial release. They remain in the case only as a nominal defendant for purposes of collecting insurance. Exhibit 113 does exactly that. The first three sentences of that, of Paragraph 1 on Exhibit 113, which is the settlement, the settlement terms, releases the insured, releases American States for uninsured liability. That's the amounts above the insurance. The second four sentences keep the insured in the case so the plaintiff has a conduit to get to the excess insurance. Your Honors, we believe that that Paragraph 1 of Exhibit 13 was clear on its face. Judge Affleck decided that the two parts of Paragraph 1 did two different things so we found it ambiguous. But doing two different things is exactly what Gascay does. It gives you a full release and then a partial release. If you read Exhibit 113 on its face and you read it together as is required under Civil Code Article 2050, then that's a full Gascay release right there. But Judge Affleck decided that the release was ambiguous so he went to outside facts and the testimony was overwhelming on this. Drew Eversberg, who negotiated that agreement, testified that that was intended, that agreement released the insured from personal exposure, period. Judge Affleck found that testimony credible and supported by the accompanying documents. These kinds of agreements mean that there is no bad faith cause of action. If that were the case, why wasn't that resolved in the first appeal up here? The first appeal, Your Honor, it was limited to the issue. I know, but we assume that there was a bad faith cause of action through segregation, but because of this, what you're telling us, there is not. It's a fantasy. We wasted our time even discussing it in that opinion. I don't think you wasted your time discussing it in that opinion. That opinion was really based on a limited legal issue on uncontested facts, essentially. Whether an excess judgment is required to assert a cause of action. It was a very limited legal issue and this court answered that you don't. The Gasquet issue wasn't relevant in that context because this case didn't have an excess judgment so it was sent back. I believe this court in the prior opinion indicated that Judge Affleck should decide that issue first. It's in footnote four, I believe, of the opinion. He did. He heard the testimony from everybody. From the two parties that negotiated the agreement and from the American States claim handler who was in charge of okaying it. All those witnesses testified this was intended to completely release the insured. That, I believe, was done by February 19th, I believe that that agreement was entered. Once that insured had a complete release, there was no... You see the circular logic. In other words, if the excess carrier gets to stand in the shoes of the insured, the insured is still suing its own excess, is still seeking coverage from its own excess carrier. It's still saying I still have the right to excess insurance, right? Yes, Your Honor. That's two different questions. I think it's factually addressed in two different ways. One, there's a time gap here. This isn't a settlement where everyone's signing at the same day. On one day, the insured is getting a full release from personal exposure. I believe it's four or five days later is when the excess enters its settlement. When the excess enters its settlement is when it obtains whatever rights the insured has. At that time, after there was no personal exposure, it stepped in the shoes of an insured who had no personal exposure. Thus, there was nothing for it to assert against us. That's basic subrogation principles, Your Honor. It's consistent also with the draft release we saw from American States, which set out the release of personal exposure. It's consistent with the plaintiff's actions around the time of the RSUI settlement. It tried to enter RSUI into the case to go straight after it for insurance because the plaintiff knew he couldn't execute a judgment on the plaintiffs. I believe Mr. Fruge's testimony was that he added the excess insurer to the case because he didn't want a $4 million malpractice case on his hands. The reason why he would have had a $4 million malpractice case on his hands is because he knew he couldn't collect a dime from the insured. An insured who is judgment-proof or who has no financial exposure has nothing to pass on. That was the second grounds that supported the opinion. It was also fact-intensive. The Gibbs case answers that question directly. It's a short case coming out of this court, but the Gibbs case holds that when an insured is released from liability, there's nothing for the insurer to subrogate to. That case flowed out of Great Southwest. It was an excess versus primary case for failure to defend. This court sent it back to the Louisiana Supreme Court to decide the duty issue. Great Southwest issued and said there's no direct duty from primary to excess, but you can subrogate. It came back to the Fifth Circuit. Fifth Circuit said, okay, you don't have a direct claim because Great Southwest said there's no duty. Now we're looking at your subrogation claim. The insured was released at the time of the excess settlement, so there was nothing to subrogate to. The excess insurer had no claim. That flows straight from this court's opinion in Gibbs, Your Honor. The cases RSUI has tried to cite on this point, the National Security case arising out of Kentucky and the Scottsdale case arising out of Missouri, they don't answer the question that's at issue here. Those cases only recognize under Kentucky law and Missouri law that a cause of action in subrogation might exist. National Security was an appeal of a Rule 12 dismissal where a Kentucky court said this cause of action doesn't even exist. Those cases basically just stand for the same proposition as Great Southwest is the cause of action. Your Honor, if you don't have any questions, I would sum up and say Judge Africk's opinion should be affirmed. Both prongs of it were correct. They certainly weren't clearly erroneous. They were based on his view of the underlying exhibits from the underlying case, and he heard the testimony of all the witnesses involved in that case as well. This court has held that the causation determination is fact intensive, so that should stand under the clear error standard. As a matter of law, under Gibbs and the Louisiana Civil Code, there is no cause of action for subrogation because the insured was released from all liability at the time of the RSUI settlement. I'm not sure Your Honors have any other questions. All right. Thank you, Judge Joyce. Mr. Higgins, you've saved time for a button. Counsel started off by saying that this was fact intensive and there were two permissible views of the evidence. I disagree. There's only one permissible view. The only evidence and witnesses presented were that of the plaintiff. The defense had nothing. So there are not two permissible views of the evidence for a trier of fact to weigh. That is the basis of this bad faith claim, plain and simple. Number two, the duty to a contract, the insuring agreement contract, calls for two things, defense and indemnity. Both of them separate and distinct. They indemnified in this case. There's no question about it. They paid their limits at the end of the day when Dr. Cessna, who they had put all of their faith into, the neurosurgeon, the only one doctor they had, didn't get the underlying materials that he needed because it was beyond the discovery cutoff date. So it was going to be excluded. So he fell apart. So, oh my God, you know, the change in circumstances. And they also said they got all of these medicals that came in on the last minute. They didn't issue any subpoenas and had they done so, those subpoenas would have had those documents that were readily available to show what the damages were. They were indemnified, but the duty to defend is totally missing in this case. How can the trial court conclude that when liability is basically uncontested, stipulated, the insurer doesn't even know about it? How can the court say that that does not affect the overall value of the case and make it more difficult? That legal error, clear error, call it what you want, that is just absurd. The trial court's judgment provides no analysis as to what the effects of these multiple breaches had on the overall value of the case. Yes, he relied on the plaintiff attorney who said at the end of the day, nothing was going to change my mind. Liability, I could care less about it. What else is the plaintiff attorney going to say in the case? Did they really expect him to say, I'll tell you what, if they had a good defense, I would have just folded. That's just ridiculous. That's why we called an expert. That's why we hired an expert. That's why when the court remanded the case, we went out and got an expert to basically say what are the duties, why are those duties there, so that the trial judge would have the benefit of that analysis. Judge Afric does not mention our expert's testimony at all. Why? I mean, it's got to be way like any other witness in the case. If he says, I disregarded it, why? Why did he disregard it? Your Honor, hit the nail on the head. If the duty of an excess carrier is going to be primary, if a gas case settlement at the end of the day, after all sins are committed, mysteriously wipes away any bad faith claim, then the excess is a primary carrier. And his premiums are going to reflect that. They made it a point in their brief to say we had $10,000 for $4 million in coverage. They had $14,000 premium for $1 million in coverage. The reason it's higher is because 98% of the cases are going to settle within that primary limit. That is the reason they have the duty to defend the case, knowing that all of the costs, expenses... You also have the right to monitor it. I realize that your client wasn't notified until a little bit later, but... A little bit later? No. We were notified on December the 28th, 14 days before discovery cut off. That's just a notification. Then we had to ask for the file. By the time the file came in and George Hepler looked at it and says, my God, nothing was done on this case. He agreed with their outside counsel who came in, Drew Eversberg, the defense outside attorney who takes over and says, nothing was done on this case. If we have not proved bad faith, I don't know what else we could have done. Please tell me so I can tell my client. The next time this happens, this is what the court says we have to do. I get a little worked up. I'm sorry. Thank you, Your Honor. The case in all today's cases are under submission. The court is in recess until 9 o'clock tomorrow.